In re LEONARD et al.

(District Court, D. Nevada. March 4, 1910.)

No. 101.

1. BANKRUPTCY (§ 114*)—TEMPORARY RECEIVERS—POWERS.

A temporary receiver of a bankrupt is merely a custodian of the estate with authority to inventory and receive and retain all of the bankrupt's assets; the purpose of his appointment being only to protect the property from dissipation and loss until it is ascertained that there is a bankrupt estate to be administered.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 114.*]

2. BANKRUPTCY (§ 484*)—TEMPORARY RECEIVERS—CHARGES—EXAMINATION OF BOOKS—CLAIM VOUCHERS.

A temporary receiver of a bankrupt was not entitled to charge for an expert examination of the bankrupt's books, nor for printing claim vouchers, nor for the services of an attorney, in the absence of an order of court authorizing the attorney's employment.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 484.*]

3. BANKRUPTCY (§ 484*)—TEMPORARY RECEIVERS—FEES.

Where a temporary receiver of a bankrupt, appointed to inventory and preserve the bankrupt's assets until after adjudication, did not perform any extraordinary service beneficial to the estate, he was only entitled to the same compensation that would be allowed a trustee for the same service prescribed by Bankruptcy Act July 1, 1898, c. 541, § 48, 30 Stat 557 (U. S. Comp. St. 1901, p. 3439).

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 484.*]

In the matter of bankruptcy proceedings against Volney B. Leonard and others, a copartnership doing business under the name and style of the Merchants' & Miners' Bank. Petition for the allowance of the report of a temporary receiver modified, and allowed as modified.

Mark Walser and George L. Sanford, for petitioning creditors.

FARRINGTON, District Judge. The petition asking that V. B. Leonard, S. W. Collins, E. H. McLaughlin, A. Freiman, Frank Knox, and the Bank of Rawhide, a copartnership doing business under the firm name and style of the Merchants' & Miners' Bank, be adjudged an involuntary bankrupt, was filed herein August 4, 1908. August 20, 1908, the Bank of Rawhide filed its separate answer denying that it was a member of said copartnership, and after a hearing this issue was decided in favor of the Bank of Rawhide. Inasmuch as it then appeared that service of process had not been made or attempted on

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

but two of the alleged members of said copartnership, the court declined to make an order of adjudication until further service had been made.   March 22, 1909, on petition of Mark Walser, a creditor of said Merchants' & Miners' Bank, Thomas A. Roseberry was appointed temporary receiver, with power to inventory, receive, and retain in his possession all of the assets of said bank until further order of the court.   Mr. Roseberry entered upon the discharge of his duties as such temporary receiver March 24, 1909.  May 3, 1909, the receiver filed his inventory and report.   The inventory contained a list of more than 100 promissory notes payable to the Merchants' & Miners' Bank, the face value of which in the aggregate was about $50,000.   The inventory also showed as property of the bank 4,800 shares of the Grutt Hill Mining Company's stock, 400,000 shares of Dixie, 1,000 shares of the Rawhide Mining & Reduction Company stock, two deeds to lots in Rawhide, about 12 pieces of jewelry, 11 bank books, 1 lot of canceled checks, 1 lot of escrow papers, 1 pistol, 2 surety bonds, and 1 fire insurance policy.   The receiver also reported as being in his possession at that time the following mentioned property, which he says was clearly shown to have been the property, not of the Merchants' & Miners' Bank, but of the Bank of Rawhide, to wit: 29 promissory notes; 1 lot of jewelry valued at $900, held as security; 13 account books; 1 burglar proof safe burned, but in fair condition; 1 large book safe, burned and worthless; 1 safe deposit box, burned and probably worthless;  6 stock certificate books belonging to various mining companies; 1 lot of cipher code books belonging to various banks; 1 lot of packages, envelopes, and papers belonging to unknown owners, and a safe deposit box not yet opened.

The written instructions to the receiver, embodied in a letter addressed to him by the court March 22, 1909, in so far as they are here pertinent, were as follows:

"You will be authorized to receive and take into possession all of the assets of the Merchants' & Miners' Bank, but you will have no power to disburse any of the funds or assets of the bank, or any other property that you may receive as such trustee, until the further order of this court.  The property so far has been in the custody of Mr. Hofer, State Bank Examiner.  Your first duty will be to receive the property from him and make a carefully itemized statement and inventory of everything you receive.  At the time the property is so received and inventoried, I wish Mr. Hofer, or his representative, to be present; also that some representative from the creditors of the bank shall be at hand, and that the inventory so made shall be vised and approved by you, Mr. Hofer, or his representative, and the representative of the creditors.  *  *  *  You will not only make a statement of all the property belonging to the bank, but also of all the property in custody or control of the bank, and all property which is turned over to you by Mr. Hofer.  This list will be sent to me, and you will do nothing with the property except to hold it until further order of the court.  None of it is to be turned over to the Bank of Rawhide or to the people who claim to own the contents of deposit boxes."

The inventory filed by the temporary receiver is not signed by the State Bank Examiner or by a representative of the creditors, nor is any reason given for the omission.   The report also fails to show the amount of money found in the safe.  According to the bank books there should have been $2,019.75.   The inventory merely shows the

receipt from T. R. Hofer, Bank Examiner, of $831.80, and of mutilated coin amounting to $5. It shows also that since the closing of the bank and up to May 3d, the date of the order, the receiver had received in currency, money orders, drafts, and checks $273.38. With this inventory the receiver presented the following bill for services and expenses from March 24th to May 3d:

Merchants' & Miners' Bank to Thomas A. Roseberry, Jr., Dr.

1909.

| | | | | |
|---|---|---|---|---|
| March | 29. | To oil and can for oiling safes | $ | 55 |
| | 31. | To hauling desk and chairs to office | | 1 00 |
| | 31. | To hauling away garbage | | 35 |
| | | To labor to one man moving safes | | 1 50 |
| | | To stove pipe | | 1 25 |
| April | 1. | To one night latch | | 1 50 |
| | 4. | To stationery | | 3 60 |
| | 5. | To express on printed stationery | | 1 65 |
| | 11. | To moving table to office | | 1 00 |
| | | To charges of Wells Fargo Co. for money orders amounting to $834.80 | | 2 45 |
| | | Turpentine, oil, etc., for opening coin safe | | 85 |
| | 19. | To H. B. Sprinkel for services and expenses in opening money chest | | 94 20 |
| | 20. | To G. W. Eytel, labor drilling chest | | 5 50 |
| | | To S. L. Gregory for blacksmith work, drilling chest | | 9 20 |
| | | To F. Gowatz, making 2 rods for chest | | 1 20 |
| | 22. | To J. A. Alexander, 23 hours' work drilling chest | | 13 80 |
| | | To E. C. Ferguson and William Kidd, labor drilling chest | | 16 30 |
| | | To assorted lot of rubber bands | | 75 |

Merchants' & Miners' Bank to Reno Printing Co., Dr.

| | | | | |
|---|---|---|---|---|
| April | 1. | 500 letter heads | $3 50 | |
| | | 250 envelopes | 2 00 | |
| | | 1,000 claim vouchers | 5 25 | |
| | | | | 10 75 |

To John Kinkaid.

| | | | | |
|---|---|---|---|---|
| April | 29. | Attorney's fees to date | | 25 00 |

To Alfred Boyle.

| | | | | |
|---|---|---|---|---|
| April | 29. | Typewriting report and stenographic services | | 15 00 |

To W. H. G. Buck.

| | | | | |
|---|---|---|---|---|
| April | 29. | To 21½ days services, experting records, and reporting on the financial condition of the Merchants' & Miners' Bank in connection with the Bank of Rawhide, of Rawhide, Nevada, at $8.00 per day | | 172 00 |

To Thos. A. Roseberry.

| | | | | |
|---|---|---|---|---|
| April | 29. | To services acting as temporary receiver, and assisting in checking records, 19 days at $8.00 per day | $152 00 | |
| | | To 14 days' services as temporary receiver at $5.00 per day | 70 00 | |
| | | | | 222 00 |

To Mark Walser.

| | | | | |
|---|---|---|---|---|
| April | 29. | To legal services rendered and to be rendered in the insolvency proceedings (this includes all traveling and other expenses) | | 250 00 |
| | | Total | | $851 40 |

It will be noted that the total amount of cash which came into the hands of the receiver during the period covered by this bill was $1,-112.38. September 11, 1909, the receiver transmitted a further report on the Merchants' & Miners' Bank affairs, furnished, as he states, at the request of J. Poujade, referee in bankruptcy, containing a further bill, which includes the bill rendered May 3d, and is as follows:

Merchants' & Miners' Bank to Thomas A. Roseberry, Jr., Dr.

| 1909. | | |
|---|---|---:|
| April. | By Reno Printing Co. | $ 10 75 |
| Sept. 9. | By safety deposit box rent from June 9 to Sept. 9, 1909, to First Exchange Bank of Rawhide. | 7 50 |
| Sept. 1. | By attorney fees to John Kinkaid. | 25 00 |
| June 30. | By individual disbursements on stamps | 50 |
| June 30. | By individual disbursements on safety deposit box rent from April 9 to June 9, 1909. | 5 00 |
| May 14. | By window glass and putty to S. W. Collins Hardware Co. | 2 10 |
| April 29. | By individual disbursements for opening safe. | 156 65 |
| April 29. | To services rendered as temporary receiver to May 1, 1909 | 222 00 |
| Sept. 1. | By services rendered as temporary receiver from May 1, 1909, to Sept. 1, 1909, 123 days at $2.50 per day. | 307 50 |
| April 29. | To Alfred Boyle, stenographic work. | 15 00 |
| April 29. | To W. H. G. Buck, to services rendered. | 172 00 |
| April 29. | To Mark Walser, to legal services. | 250 00 |
| | Total | $1,174 00 |

Thus the total bills for receiving and keeping possession of the property of the Merchants' & Miners' Bank from March 24 to September 1, 1909, including attorney's fees, amount to $1,174; and the total amount of cash and money values which came into the hands of the temporary receiver as such was but $1,773.18.

Bankruptcy Act July 1, 1898, c. 541, § 2, subd. 3, 30 Stat. 545 (U. S. Comp. St. 1901, p. 3421), authorizes the court to appoint a receiver of the property of the alleged bankrupt when absolutely necessary for the preservation of the bankrupt estate; the appointment can be made only after the filing of the petition, and the authority of the receiver so appointed ceases when the petition is dismissed, or, if there be an adjudication, as soon as the trustee selected by the creditors is qualified.

In this case the receiver was appointed to preserve the bankrupt estate. Under the authority conferred upon him he was merely a custodian of the estate, with authority to inventory, receive, and retain in his possession all the assets of the alleged bankrupt.

It is proper that there should be an inventory in order that there may be no misunderstanding as to the amount and character of the property in the custody of the receiver. A sufficient reason for the limited power and authority in such a temporary officer is that prior to and pending an adjudication in bankruptcy the property belongs to the bankrupt, and to him alone, and therefore the court can and should do no more than protect the property from dissipation and loss until it is ascertained that there is really a bankrupt estate to be administered upon.

It was not shown, nor has any attempt ever been made to show, that the preservation of the property described in the inventory here, prior to adjudication, demanded that the books of either the Merchants' & Miners' Bank or of the Bank of Rawhide should be experted. Such a service was not authorized by the court, nor was it ever intimated to the court in any way that such an expenditure was in contemplation until the bills therefor were presented and filed in this court May 3, 1909. The item of $172, alleged to be due W. H. G. Buck for 21½ days' services experting records, at $8 per day, and the item of $152, alleged to be due Thomas A. Roseberry for 19 days of similar service, cannot be allowed. The item of $5.25 for printing claim vouchers was entirely unnecessary and improper; until adjudication it could not be known that there would be any use for claim vouchers, and when claims are presented they should be prepared at the expense of the creditor, and not at the expense of the estate. This item, also, is disallowed. As to the item of $25, alleged to be due John Kinkaid for attorney's fee, it is not shown what, if any, services were ever rendered. Moreover, a temporary receiver charged simply with the custody and safe-keeping of cash, stock, and evidences of indebtedness of an alleged bankrupt should always apply to the court for leave to do so before employing an attorney at the expense of the estate.

In Re T. E. Hill Co., 159 Fed. 73, 77, 86 C. C. A. 263, 267, the Circuit Court of Appeals for the Seventh Circuit says, in sustaining an order denying the receiver an allowance for compensation of his attorney:

"Ordinarily, the duties of this statutory receiver neither require nor justify employment of an attorney, and it is plain that no claim for such services is chargeable per se as against the estate, predicated alone upon the fact of employment and service rendered."

Until it is made to appear that this is a proper charge against the estate—in other words, that the services rendered were rendered in behalf of the estate and were of the actual value of $25—the charge cannot be allowed. Collier on Bankruptcy (7th Ed.) p. 690.

In section 64b(3) of the bankruptcy act, it is provided that the court may direct the trustee to pay "one reasonable attorney's fee, for the professional services actually rendered, irrespective of the number of attorneys employed, to the petitioning creditors in involuntary cases."

Mr. Sanford and Mr. Walser will be allowed $250 for all legal services performed to date. This amount includes a full allowance for all personal expenses incurred by the attorneys. Considering the fact that Mr. Walser has made several trips to Carson from Rawhide at his own expense, and that the interests of the creditors have been represented by Mr. Walser and Mr. Sanford, both in the proceedings prior to the adjudication, and also on the motion of Frank Knox to set aside the adjudication, the sum of $250 seems to be a reasonable fee.

The amount charged by the receiver for his services, if we consider merely what was necessary for the preservation of the property under the instructions of the court, is excessive.

Bankruptcy Act, § 2, subd. 5, invests the District Court of the United States in the several states with jurisdiction to "authorize the business of bankrupts to be conducted for limited periods by receivers * * * if necessary in the best interests of the estate, and allow such officers additional compensation for such services, but not at a greater rate than in this act allowed trustees for similar services."

In this case the receiver has not carried on the business of the bankrupt, nor was he authorized so to do; consequently, the additional compensation here provided for is not permissible.

By section 48 of the bankruptcy act, trustees are allowed "from estates which they have administered such commissions on all moneys disbursed by them as may be allowed by the courts, not to exceed six per centum on the first five hundred dollars or less, four per centum on moneys in excess of five hundred dollars and less than fifteen hundred dollars, two per centum on moneys in excess of fifteen hundred dollars and less than ten thousand dollars, and one per centum on moneys in excess of ten thousand dollars."

Section 72 declares:

"That neither the referee nor the trustee shall in any form or guise receive, nor shall the court allow them, any other or further compensation for their services than that expressly authorized and prescribed in this act."

In Re Richards (D. C.) 127 Fed. 772, and again in Re Cambridge Lumber Co. (D. C.) 136 Fed. 983, Judge Lowell held that a receiver who had been continuing and conducting the business of the alleged bankrupt could receive no greater compensation for his services than the percentage allowed by the act to a trustee. On the other hand, it has been held that the provision and limitation, in so far as it relates to the services of a receiver, has reference only to services in conducting the business of the bankrupt, and that it presupposes some compensation is also to be allowed for services rendered in taking charge of and caring for the property.

In Re Kirkpatrick, 148 Fed. 812, 78 C. C. A. 501, where the receiver, with the assistance of his attorney, had recovered large amounts of property belonging to the bankrupt estate which otherwise would probably have been lost, it was held by the Circuit Court of Appeals that the amount of compensation was within the discretion of the court. And in the case of In re Sully (D. C.) 133 Fed. 997, where the receiver's management had been exceptionally able and profitable to the estate, and unexpectedly large sums had been realized for property sold, the court awarded fees much larger than those which the law permitted to be allowed trustees.

In the present case, what has the receiver done which will justify compensation in excess of that which the law fixes for the regular trustee? In his bill there is a charge of $2.45 for Wells Fargo & Co. money orders amounting to $834.80. This probably is the money received from Bank Examiner Hofer. We may assume that this money was sent to the proper United States depository for funds belonging to bankrupt estates, and that the money orders were purchased for that purpose. The same bill shows a charge of $12.50 for the rental of a safety deposit box in the First Exchange Bank of Rawhide from

April 9 to September 9, 1909. We may therefore assume that the promissory notes, securities, and other valuable papers and documents, as well as jewelry, were cared for in the vaults of that bank. In this manner the custody of the greater portion of the property could and should, and probably was maintained; and, as to some of the other property, we learn from a memorandum on the back of the final report that the receiver since the completion of the foregoing report had "received advice that the following named property, assessed in the name of the Merchants' & Miners' Bank, had been sold for taxes, to wit: Block #5, lot #1, and improvements; block #4, lot #6; block #8, lot #9, and improvements; Eckstein & Kelly Dance Hall; one-half interest in Harbold building; block #1, lot #5; bank fixtures."

In the letter of instruction from the court addressed to the receiver at the time of his appointment, he was directed to prepare an inventory of the property received at the time it was turned over to him by the State Bank Examiner, and to have this list or inventory vised and approved by the State Bank Examiner, also by a representative of the creditors. This has never been done.

Although the estate is charged with a bill of $156.65 for opening safes, neither the first nor the second report of the receiver states what was found therein. It appears from the books that there was more than $2,000 on hand at the time the bank was closed; it also appears that State Bank Examiner Hofer turned over to the receiver but $834.80. For aught that appears in the record, the whole $2,000 may have been in the safe when it was opened. When the money reached the hands of the receiver from the Bank Examiner, $1,200 had disappeared, and by May 3d, less than two months after the receiver had been appointed, bills for the receiver, including his expenses, claims for attorneys' services, and the cost of opening the safe, amounted to $851.

In a letter to the clerk of this court, and now a part of the record herein, the receiver states that he was not even present when the coin safe was opened. This was an event of great importance to the estate, more so than any other which has occurred since adjudication. The absence of the receiver was very unfortunate, to say the least.

In every case to which my attention has been called where the receiver has been allowed compensation greater than that allowed a trustee, it has been justified and warranted by good results, and by management of such efficiency that the assets of the alleged bankrupt estate have been greatly increased, or that assets which otherwise would have been lost have been preserved and saved to the estate. Nothing thus far has been shown which justifies compensation for the receiver largely in excess of what would have been allowed a trustee for the same services. The receiver will therefore be allowed $150.

The claim of $20 for a desk and chair sold by W. N. Coyle to T. A. Roseberry, Jr., for his use as temporary receiver, will be allowed, provided the desk and chair are worth $20, and they are at once turned over to the trustee to be sold. This expenditure was neither authorized by the original appointment nor by the court, nor has any showing been made of conditions which warranted such a purchase. I am in-

formed by the referee in bankruptcy that at a meeting of the creditors of the estate regularly held in Rawhide, October 1, 1909, six persons were present representing claims amounting to nearly $8,000. At this meeting it seems to have been the general opinion that the bills presented by the receiver should be paid. Notwithstanding the great respect which should be paid to an opinion emanating from such a source, the court must be guided by the law, and must also remember that many creditors of the Merchants' & Miners' Bank were neither present nor represented at that meeting. There is nothing in the law, nor in this opinion, however, which will prevent such creditors, and others who may be like minded, after the assets of the estate have been distributed to the creditors, from making up to Mr. Roseberry and Mr. Buck the full amount of their claims.

The claims authorized to be paid by the present trustee of the estate are as follows:

| | |
|---|---|
| T. A. Roseberry, for services as receiver | $150 00 |
| T. A. Roseberry, for disbursements for opening safe, etc | 156 65 |
| T. A. Roseberry, for safety deposit box rent in First Exchange Bank of Rawhide | 12 50 |
| T. A. Roseberry, for Reno Printing Co | 5 50 |
| T. A. Roseberry, for stamps | 50 |
| T. A. Roseberry, for S. W. Collins Hardware Co., for window glass, putty, etc | 2 10 |
| T. A. Roseberry, for desk and chair | 20 00 |
| Alfred Boyle, for stenographic work | 15 00 |
| Messrs. Walser and Sanford, attorney's fee | 250 00 |